# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
March 2, 2004 Session

## STATE OF TENNESSEE v. VINCENT JACKSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 96-12127     John P. Colton, Jr., Judge**

---

**No. W2003-01212-CCA-R3-CD  - Filed April 16, 2004**

---

A jury convicted the defendant of premeditated first degree murder, and the trial court sentenced him to life imprisonment.  On appeal, the defendant contends: (1) the trial court erred in denying his motion to suppress his statement to the police; (2) the trial court erred in denying his motion for a new trial due to jury misconduct; and (3)  the evidence is insufficient to support his conviction.  We reduce the conviction to second degree murder and remand for sentencing.

**Tenn. R. App. 3 Appeal as of Right; Judgment of Conviction of the Criminal Court Reduced to Second Degree Murder; Remanded for Sentencing**

JOE G. RILEY, J., delivered the opinion of the court, in which DAVID G. HAYES and JOHN EVERETT WILLIAMS, JJ., joined.

Robert L. Parris, Memphis, Tennessee (at post-trial hearing and on appeal); Mike Roberts, Memphis, Tennessee (at post-trial hearing); and Betty Thomas, Assistant Public Defender (at trial), for the appellant, Vincent Jackson.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; William L. Gibbons, District Attorney General; and Daniel R. Woody, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant was convicted of premeditated first degree murder for shooting and killing Ernest Harris on January 25, 1996.  Nakita Robinson, a friend of the victim, testified she last saw the victim alive at her residence on January 25 between 8:00 and 8:45 a.m.  Robinson stated the victim's pager activated, and the victim responded approximately five minutes later.  The victim then left Robinson's residence carrying a red tote bag and driving his car.  Robinson stated the victim sold drugs, including powder cocaine, and she assumed he was making a delivery. Robinson testified the victim had been convicted of unlawfully possessing a firearm, was on probation, and, as a result, she was "more positive that he did not have a gun."

Mary Fennell testified she was living at 6 West Rollins located near Old Horn Lake Road in Memphis, Tennessee. Fennell stated her son, her daughter, and her daughter's friend were at the residence when she left for work at 4:45 a.m. When Fennell returned to the residence at approximately 2:00 p.m., she observed blood on a chair, the carpet, and the draperies. Fennell stated she contacted her children, none of whom had knowledge of the blood. Fennell further stated she paged the defendant, who was "like a son" and who possessed a key to the residence, and when he returned the page, he denied any knowledge of the blood.

Fennell testified she subsequently contacted the police, and officers came to her residence. The officers informed Fennell that the substance was red paint and not blood. Fennell stated a detective came to her residence on the following night, questioned her regarding the substance, and identified the substance as blood.

Officer Rochelle Barham of the Memphis Police Department testified that on January 26, an anonymous caller reported a vehicle parked on Horn Lake Road with a body inside the trunk. Officer Barham stated she discovered a vehicle parked on the side of Old Horn Lake Road. Officer Barham testified that upon looking inside the trunk, she discovered the victim's body with a white plastic garbage bag over his head.

Sergeant Edward Cash, who was assigned to the Homicide Bureau of the Memphis Police Department, testified that upon arriving at the area of Old Horn Lake Road, he observed the victim's body inside the trunk of the vehicle. Sergeant Cash observed a white plastic bag over the victim's head with a red drawstring pulled tightly around the victim's neck. Sergeant Cash stated that upon removing the bag which contained a large amount of blood, he observed two bullet holes at the top left side of the victim's head. Sergeant Cash proceeded to the residence on West Rollins, observed blood on the carpet and draperies, and learned that the defendant had been at the residence on the previous day.

Sergeant Cash testified that while at Fennell's residence during the early morning hours, he paged the defendant, who agreed to meet with him at the police station within the hour. Sergeant Cash stated the defendant did not arrive at the homicide office until 11:00 a.m. or 12:00 p.m. the next day, and the defendant's brother accompanied him to the office. Sergeant Cash advised the defendant of his *Miranda* rights, and the defendant signed the waiver of rights form.

Sergeant Cash testified he and Sergeant Nichols interviewed the defendant, who initially denied any involvement in the victim's death. The defendant subsequently confessed to the offense and gave a written statement to the police, which was read into evidence at trial. Sergeant Cash stated the defendant cried while giving the statement and that he never requested an attorney. The defendant told the officers that on January 25 between 8:30 and 9:00 a.m., while at 6 West Rollins, he shot the victim twice in the back of his head. The defendant explained to the officers that he shot the victim because "[w]e had set up a deal. I didn't have all of my money, and I tried to grab the dope and run out with it; and he grabbed me; and I shot him."

According to the defendant's written statement, he first met the victim three weeks prior to the victim's death and had previously been acquainted with him through mutual friends. The

defendant and the victim negotiated a deal involving "[a] quarter key and a half of a quarter key" of powder cocaine. The defendant told the police that he paged the victim on January 25 at approximately 8:00 a.m. from Fennell's residence. The defendant then paged the victim a second time and began walking to the grocery store when the victim returned the page. The defendant called the victim from a pay telephone located in front of the grocery store and gave him directions to Fennell's residence.

The defendant told the police that the victim arrived at Fennell's residence thirty to forty minutes later. The victim sat in a chair in the living room while the defendant sat on the couch. While discussing the transaction, the defendant informed the victim that he was approximately $3,500 short. The defendant stated:

> Me and [the victim] kind of got into a verbal misunderstanding about the amount I was to pay so I grabbed the dope and the money and proceeded to run out of the house. [The victim] was still seated in the chair when I grabbed the bags. As I was going for the door, [the victim] reached out and grabbed for me and proceeded to try to get up from the chair. I pushed [the victim] with my left hand, with the dope and the money in hand, back into the chair. That's when I reached into my pocket with my right hand and grabbed my gun and shot [the victim] in the back of the head twice while [the victim] was still seated.

The defendant informed the police that he placed the drugs, the money, and the gun inside another room, returned to the living room, observed a pool of blood near the victim's body, and "panicked." The defendant retrieved a garbage bag from the kitchen, placed it over the victim's head, and pulled the drawstring around the victim's neck to prevent the blood from dripping. The defendant explained to the police that he then carried the victim's body downstairs and placed his body on the floor at the bottom of the steps. The defendant retrieved the victim's keys from the coffee table in the living room, backed the victim's vehicle to the residence, retrieved the victim's body from inside the residence, and placed him inside the trunk. The defendant told the police that he then rearranged the furniture, used towels which he retrieved from the bathroom in an attempt to clean the blood, and placed the towels in a garbage bag.

According to the defendant's statement to the police, he retrieved his gun, the drugs, and the money and drove the victim's vehicle to Old Horn Lake Road where he abandoned the vehicle at the side of the road. The defendant threw the vehicle keys into the woods across from the vehicle and began walking down the street. The defendant discarded the bag of towels in a dumpster at a gas station, walked to his vehicle parked on West Rollins, drove away from the scene, and "just rode around." The defendant stated that at approximately 4:00 p.m., he responded to a page from Fennell who questioned him regarding the blood at her residence, and he denied any knowledge of the blood. The defendant said he subsequently threw the drugs and his gun into the river.

Dr. Wendy Gunther, the assistant medical examiner for Shelby County, testified she performed an autopsy on the victim. The victim died as a result of two gunshot wounds to the back of his head, both of which passed through his brain. Dr. Gunther opined that the gun was fired at a distance of more than three feet away from the victim's head. She stated she observed neither

burned powder nor "stippling" near the area of the wounds. Dr. Gunther testified she was unable to ascertain the location of the shooter and the victim when the shooting occurred. She stated that based upon the paths of the bullets, if the victim had been kneeling, the shooter could have been standing behind him and pointing the gun downwards.

Michael Jackson, the defendant's brother, testified he drove the defendant to the police department. Upon arriving, the officers escorted the defendant to another room. After a period of time, Sergeant Nichols and Sergeant Cash exited the room where the defendant was located and requested that Jackson speak to the defendant. Jackson testified he instructed the defendant to tell the officers anything he knew and that the defendant did not respond. Jackson stated the defendant began crying and requested an attorney. Jackson subsequently left.

The defendant testified at trial that he had been a "wholesaler" of cocaine. The defendant stated that although he knew the victim through mutual friends, he first engaged in a conversation with the victim approximately three weeks prior to the incident. The victim, who also sold drugs, gave the defendant his pager number and told him to call if he needed any drugs. The defendant stated he received a page from the victim on January 24, and he returned the page the next morning while at Fennell's residence.

The defendant testified that upon arriving at Fennell's residence, her daughter, her son, and her daughter's friend were preparing to leave for school. After they left, he paged the victim a second time and then drove to a grocery store. While in route, the defendant received a page from the victim between 8:00 and 8:30 a.m. and called the victim from a telephone at the grocery store. The defendant recalled that upon learning that the victim had "dope," he instructed the victim to bring either "a quarter or a half a quarter" and provided him with directions to Fennell's residence. The defendant stated he had expected to purchase "[a] quarter key" or two pounds of cocaine for $6,000, although they had not discussed the price prior to the victim's arrival.

The defendant testified the victim arrived at Fennell's residence carrying a "tote bag," which he placed on the table next to the defendant's money. The defendant sat on the couch while the victim sat in a chair. The defendant stated the victim informed him that he had "a quarter" and would sell it for $7,500. The defendant further stated he informed the victim that he only had $6,000; they attempted to negotiate; and the victim refused to lower the price.

The defendant testified he arose from his seat and informed the victim that he could not afford to purchase the drugs. The defendant stated that as he was walking toward the door, he took his bag of money and accidentally took the bag of drugs. According to the defendant, the victim jumped out of his chair, began "assaulting" the defendant, and had his arm underneath the defendant's throat as the defendant continued to grasp the money and the drugs.

The defendant testified that when he pushed the victim into the chair, the victim grabbed his arm and threatened to kill him. The defendant stated it appeared the victim was reaching for a gun, so the defendant retrieved his gun from his pocket. The defendant further stated he ducked behind the chair, raised his gun, and shot twice although he was unable to see the victim. The defendant stated that although he believed the victim was reaching for a gun, he never saw the victim with a

gun and was unsure whether the victim possessed a gun. The defendant testified he purchased his gun on the street for $50. He stated he always carried the loaded gun with him for protection.

The defendant testified portions of his written statement to the police were incorrect. The defendant denied telling the police that he shot the victim as he was attempting to escape the residence with the drugs. The defendant stated he did not tell the police that he was $3,500 short; rather, he was $1,500 short. He denied taking the money and drugs with him to Old Horn Lake Road.

The defendant also testified regarding the circumstances under which he gave the statement. The defendant stated he read and signed a waiver of rights form, and Sergeant Cash questioned him while Sergeant Nichols took notes. The defendant testified that as the officers continued to question him regarding the incident, he became frightened and requested a lawyer. The defendant stated the officers ignored him. The defendant said he cried and eventually "just broke down and said [he] killed [the victim]." The defendant explained that although he signed and dated the statement, he was too emotional to read the statement.

The defendant was charged with felony murder during the perpetration of a robbery and premeditated first degree murder. *See* Tenn. Code Ann. § 39-13-202(a)(1), (2). The jury acquitted him of felony murder and convicted him of premeditated first degree murder. The defendant received a sentence of life imprisonment.

## I. MOTION TO SUPPRESS

The defendant contends the trial court erred in denying his motion to suppress his statement to the police. Specifically, the defendant maintains the officers denied his request for an attorney and that his statement was involuntary and the result of coercion. However, the defendant failed to include this issue in his original and amended motions for new trial. Therefore, this issue is waived. Tenn. R. App. P. 3(e); *see* State v. Walker, 910 S.W.2d 381, 386 (Tenn. 1995). Furthermore, based upon the record before us, we are unable to find plain error. *See* Tenn. R. Crim. P. 52(b).

## II. JURY MISCONDUCT

The defendant contends the trial court erred in failing to grant the motion for new trial based upon jury misconduct in violating sequestration. We disagree.

### A. Hearing on Motion for New Trial

In support of his motion, the defendant presented the testimony of Sergeant Michael Collins, one of the four deputies who attended to the sequestered jury during the defendant's trial. Sergeant Collins recalled that his duties included staying with the jury at a hotel, accompanying them to court, and transporting them to and from meals. The deputies assigned two jurors per hotel room and removed the television and telephone from each room. The deputies also maintained a "hospitality room" where the jurors could watch television and make telephone calls under the deputies' supervision.

-5-

Sergeant Collins testified that on Thursday, March 12, 1998, the third night at the hotel, he entered the hospitality room between 11:30 p.m. and 12:00 a.m. in order to prepare for his shift which began at 12:00 a.m. Upon entering the room, he observed two jurors, Kenetria White and Barbara Marion, watching television and a male non-juror sitting at a desk. Sergeant Diane Plunk, the deputy who was then on duty, was also in the room and introduced the man to Sergeant Collins as her husband. Sergeant Collins testified he and Sergeant Plunk discussed her husband's presence. Sergeant Collins stated that while speaking to Sergeant Plunk, he smelled alcohol on her breath. Sergeant Collins stated he never heard the four people discussing the trial.

Sergeant Collins stated that on the first or second night at the hotel, he observed Sergeant Plunk drinking alcohol, and she was intoxicated. Sergeant Collins stated he was unaware of whether Sergeant Plunk had a shift involving the supervision of jurors on that night. He further stated he was unaware of Sergeant Plunk engaging in any conduct to influence the jury, and he felt the jurors were otherwise adequately supervised.

The state presented the testimony of the twelve jurors at the defendant's trial, the alternate juror, Sergeant Plunk, and Mike Plunk, Sergeant Plunk's husband. Juror Katie Guy testified that at 8:00 or 8:30 p.m. on Thursday night, prior to reaching a verdict on Friday, she consumed two "[s]mall cans" of beer while inside the hospitality room. Guy stated her roommate, "Barbara," was also drinking beer. Sergeant Plunk had purchased the beer for them, and they retrieved the beer from inside the sergeant's room. Guy stated she did not become intoxicated and did not experience any physical effects as a result of consuming the beer.

Guy testified that on Thursday night, she and her roommate came into contact with Sergeant Plunk's husband while in the hospitality room. Sergeant Plunk had earlier informed Guy that her husband would be coming to the hotel to bring her medicine. Guy stated Sergeant Plunk introduced her husband to her and her roommate. Guy and her roommate remained inside the hospitality room watching a movie with Sergeant Plunk and her husband for thirty minutes to one hour. Guy was unable to recall speaking to Sergeant Plunk's husband or hearing any conversation between Sergeant Plunk and her husband. Guy stated trial matters were not discussed.

Juror Kenetria White testified that between 8:00 and 9:00 p.m. on the last day of trial, she consumed one sixteen-ounce can of beer while inside of her hotel room. She gave Sergeant Plunk money to purchase the beer, and Sergeant Plunk brought the beer to her. She stated she did not become intoxicated or feel any physical effects as a result of drinking the beer. She further stated she was unaware of any other jurors who consumed alcohol, and she did not observe beer inside the hospitality room. She maintained she did not discuss the trial while consuming the beer.

Kenetria White also testified that while standing in line at a restaurant with the other jurors one night, she recognized a female non-juror, and they greeted each other "in passing." She stated she did not refer to the person by her name and did not know the person's identity.

Kenetria White further testified that during one evening in which the jury was not deliberating, she observed Sergeant Plunk speaking to a male non-juror inside the hospitality room. She stated she and the man greeted each other but did not engage in a conversation. She did not hear

the conversation between Sergeant Plunk and the man, and she did not observe the man speaking to other jurors.

Juror Barbara Marion testified she observed a male non-juror standing inside of the hospitality room. Marion stated the man did not speak to her and no one else was in the room at that time. Marion subsequently informed Sergeant Plunk, who stated the man may be her husband. Marion stated that upon reentering the hospitality room, she observed the man and Sergeant Plunk talking. Marion further stated that although other jurors entered the room, she did not observe the man speaking to the jurors.

Juror Lloyd Wiggins testified that during breakfast on the last morning prior to reaching a verdict, he observed a sergeant removing a non-juror from the buffet line. Wiggins stated the non-juror did not speak to him, and he did not observe the non-juror speaking to other jurors.

Juror Larry Brimm testified that at approximately 8:00 p.m. on Thursday night prior to reaching a verdict on Friday morning, he and two female jurors consumed beer in a hotel room. Brimm stated he observed one "twelve-pack" of beer inside the room, but he did not know who obtained the beer. Brimm recalled he consumed two or three beers but was unable to recall the number of beers consumed by the two female jurors. Brimm did not recall discussing the trial while drinking the beer. He testified he did not become intoxicated or otherwise impaired.

Juror Ivory Jackson testified that on Thursday evening while leaving the deliberations room to go to dinner, some of the jurors asked Sergeant Plunk to purchase beer. Sergeant Plunk agreed and instructed the jurors to keep "hush-hush." Jackson stated Brimm, Forrest, Lloyd Wiggins, "Kay," and "Katerina" gave Sergeant Plunk money to purchase the beer. Sergeant Plunk instructed the jurors to retrieve the beer from her room. Jackson testified that later that night, he observed his roommate, "Forrest," drink one can of beer in their room. Jackson further stated Forrest did not appear intoxicated or otherwise impaired.

Juror Patricia Hooper testified that on Thursday afternoon as Sergeant Plunk was collecting money to purchase various personal items, some of the jurors "jokingly" commented about purchasing beer. Hooper stated she was unaware of whether beer was purchased and whether any jurors consumed alcohol. Similarly, alternate juror Joseph Ignatoski testified he heard a juror say in a "kidding" fashion, "[W]ish we had alcohol." Ignatoski stated he did not observe any jurors consuming alcohol.

Juror Patricia Hill testified four or five jurors requested alcohol, but she was unaware of whether the alcohol was obtained. She stated she did not observe the jurors or the deputies drinking alcohol. Juror Helen Duke testified that on Thursday afternoon after the jury had concluded deliberations for the day, one of the female deputies agreed to purchase beer and collected money from at least three jurors. Duke stated she was unaware of whether the deputy purchased alcohol and did not observe any jurors or deputies who appeared to have been drinking alcohol.

Jurors Brimm, Dovie Forrest, Jackson, Leslie Jones, Jeanice White, Hooper, Ignatoski, Hill, and Duke testified they had no contact with members of the general public while they were

sequestered. Forrest, Jones, Wiggins, Jeanice White, and Marion stated they were unaware of jurors consuming alcohol.

Sergeant Diane Plunk testified she was the ranking officer assigned to the jury at the defendant's trial. Sergeant Plunk stated the jurors had been requesting beer since the beginning of trial, and the trial judge refused the request. When one of the deputies informed Sergeant Plunk that the jurors were requesting beer, Sergeant Plunk mistakenly believed the judge was aware of the request. Sergeant Plunk stated four or five jurors requested three different brands of beer. While the jurors were eating dinner, Sergeant Plunk purchased three six-packs of beer. At approximately 9:00 p.m., Sergeant Plunk took the beer to her hotel room where the jurors retrieved it. Sergeant Plunk stated she observed no evidence that the jurors became intoxicated. The sergeant further stated she did not consume alcohol while supervising the sequestered jury.

Sergeant Plunk testified that on that same night, she telephoned her husband, asked him to bring clothing and medication, and gave him her room number. Upon arriving at the hotel, he telephoned her and, unable to contact her, went to her room. Sergeant Plunk stated a juror subsequently informed her that a "strange man" was in her room, and the juror stated she did not speak to the man. Sergeant Plunk told the juror that the man was likely her husband. Sergeant Plunk then entered her room and informed her husband that she had to accompany jurors to the hospitality room. Sergeant Plunk stated she instructed him that he could not speak with the jurors. Upon entering the hospitality room, Sergeant Plunk instructed everyone in the room not to discuss the trial.

Sergeant Plunk testified her husband remained with her in the hospitality room from 11:25 p.m. until midnight, and they watched a movie with some of the jurors. Sergeant Plunk stated that while other jurors spoke to them, they did not discuss the trial. After Sergeant Plunk's shift concluded, her husband accompanied her to her room where he remained until the sergeant fell asleep.

Mike Plunk, Sergeant Plunk's husband, testified he went to the hotel after 10:00 p.m. to bring clothes and medicine to his wife. After several unsuccessful attempts to call Sergeant Plunk from the lobby, he went to her room. He stated that while exiting the elevator, he saw a woman whom he believed to be "Wanda," another deputy. He asked the woman if she was Wanda, and the woman said she was not. He stated they did not engage in further conversation, and he went to Sergeant Plunk's room. He did not encounter any other individual until he spoke to Sergeant Plunk.

Mike Plunk testified Sergeant Plunk entered her room a few minutes after he arrived, and he gave the clothes and medicine to Sergeant Plunk. He stated they then went next door to the room where he had encountered the woman. He and Sergeant Plunk stood at the doorway and talked while one or two jurors watched television inside the room. He stated that although he may have greeted the jurors, he did not engage in "meaningful" conversation with them. He further stated he did not discuss the trial or attempt to influence the jury and that he was unfamiliar with the facts and nature of the trial.

In its written order denying the defendant's motion for new trial, the trial court found the state had overcome the presumption of prejudice. Specifically, the trial court found Mike Plunk's testimony sufficiently rebutted the presumption of jury tampering.

## B. Analysis

Sequestered jurors are prohibited from "separating at times when they are not engaged upon the actual trial or deliberation of the case." Tenn. Code Ann. § 40-18-116 (1997). The purpose of the sequestration rule is to protect juries from outside influences in order to ensure that the jurors will base their verdict only upon evidence presented at trial and, thus, preserve an accused's right to a fair trial and an impartial jury. State v. Bondurant, 4 S.W.3d 662, 671 (Tenn. 1999). However, the sequestration rule does not literally require each juror to remain in the presence of the other jurors at all times; rather, the "real test is whether a juror passes from the attendance and control of the court officer." *Id.*

Once a defendant establishes separation of a sequestered jury, the burden shifts to the state to show that the separation did not result in prejudice to the defendant. Gonzales v. State, 593 S.W.2d 288, 291 (Tenn. 1980). As our state supreme court has recognized, "[i]t is the opportunity of tampering with a juror, afforded by the separation which constitutes the ground for a new trial, but if such separation afforded no such opportunity, there can be no cause for a new trial." *Id.* (quoting Cartwright v. State, 80 Tenn. 620, 625 (1883)). Accordingly, if the state fails to establish that the defendant was not prejudiced as a result of the separation, a new trial is required. Bondurant, 4 S.W.3d at 672.

The defendant contends numerous violations of jury sequestration occurred when jurors came into contact with Mike Plunk at the hotel, when juror Kenetria White spoke to an unknown woman at a restaurant, and when deputies removed a civilian from the jury's line at a restaurant. However, we question whether all of these instances constituted juror sequestration violations. As we noted, the test is "whether a juror passes from the attendance and control of the court officer." *Id.* at 671. The evidence indicates that the deputies were present during the instances occurring at the restaurant. Furthermore, only juror Barbara Marion came into contact with Mike Plunk outside of Sergeant Plunk's presence, thus constituting a sequestration violation. Sergeant Plunk was present when her husband came into contact with other jurors.

Regardless, we conclude the state met its burden in establishing that the defendant was not prejudiced by any sequestration violation. The state presented the testimony of each and every juror on the panel, including an alternate juror, as well as the testimony of other material witnesses. Sergeant Plunk, Mike Plunk, and jurors Guy, Kenetria White, and Marion testified they did not discuss the trial, and Plunk stated he was unaware of the facts and circumstances underlying the trial. Kenetria White testified that while at the restaurant, she and the unknown woman merely exchanged greetings in passing. Juror Wiggins stated the civilian, whom deputies removed from the jury's line at a restaurant, did not speak to him, and Wiggins did not observe the civilian speaking to other jurors.

The defendant maintains the state failed to carry its burden because the passage of time "eroded" the memories of the jurors. The record reflects that the defendant was sentenced on March 13, 1998. On March 24, the trial court informed the parties of an on-going investigation by the internal affairs division of the Sheriff's Department regarding misconduct by a deputy assigned to the jury during the defendant's trial. Trial counsel filed a motion for new trial on April 9.

After April 1998, the record reflects a convoluted procedural history. Trial counsel, an assistant public defender, left the public defender's office and withdrew from representation. Several attorneys were appointed but, due to various reasons, were unable to complete the hearing on the motion for new trial. Because of these problems, testimony by the jurors and other witnesses was taken piecemeal over a long period of time. The presentation of evidence and arguments was not completed until January 2003, and the order denying the motion for new trial was filed in May 2003.

While we are appalled by this time period, we are unable to conclude the passage of time eroded the memories of the jurors to such a degree that the state was unable to meet its burden. We note that this issue primarily involves the credibility of the witnesses, which is an issue within the primary purview of the trial court. *See* State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). The trial court was aware of the passage of time, listened to the witnesses' testimony, and found that the state established the sequestration violations did not result in prejudice. Although the defendant correctly contends that many of the witnesses were unable to recall certain details, no juror or witness indicated the imparting of extraneous information to the jury that had any relevance to the trial. Furthermore, Sergeant Plunk and many of the jurors gave statements to the internal affairs division of the sheriff's department very shortly after trial. During the hearings on the motion for new trial, the defense possessed and utilized these statements in examining witnesses and identified any inconsistencies to the trial court. We decline to disturb the trial court's ruling, which in most respects depended upon the credibility of witnesses.

The defendant argues that "the credibility of some of those jurors must be questioned" and cites to evidence that jurors consumed alcohol in contravention of the trial court's orders. We in no way condone the actions of some of these jurors that were in violation of the trial court's instructions. Such actions are contemptible; however, the issue before us is whether the defendant suffered prejudice as a result of jury misconduct. The record before us clearly reveals that this is not a case of a drunken jury deliberating the fate of one accused of murder. Although some jurors conceded they consumed beer despite the trial court's instructions, the record reveals they did not become intoxicated or otherwise impaired as a result. The jurors drank the beer after deliberations had concluded for the night. The evidence does not indicate that the alcohol in any way impaired their ability to deliberate or that the jurors consumed alcohol while deliberating. In fact, many jurors testified they were unaware that other jurors had consumed alcohol while sequestered.

In denying the defendant's motion for new trial, the trial court accredited the state's proof indicating the sequestration violation did not result in prejudice. The evidence does not preponderate against the trial court's finding.

# III. SUFFICIENCY

The defendant contends the evidence is insufficient to support his conviction for premeditated first degree murder. Specifically, the defendant submits the evidence presented at trial is insufficient to establish premeditation. We agree.

## A. Standard of Review

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence as well as all factual issues raised by the evidence. State v. Elkins, 102 S.W.3d 578, 581 (Tenn. 2003). Nor may this court reweigh or re-evaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the state is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id.* Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

## B. Analysis

The applicable definition of first degree murder is "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation necessitates "a previously formed design or intent to kill," State v. West, 844 S.W.2d 144, 147 (Tenn. 1992) (citations omitted), and "an act done after the exercise of reflection and judgment . . . [meaning] that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). It also requires that the accused be "sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

The element of premeditation is a question of fact to be determined by the jury from all the circumstances surrounding the killing. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Our supreme court delineated several circumstances that may be indicative of premeditation, including declarations of the intent to kill, procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, destruction or secretion of evidence, and calmness immediately after the killing. State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000).

In Tennessee, when a homicide has been established at trial, it is presumed to be second degree murder, and the burden is on the state to prove the element of premeditation sufficient to raise the offense to first degree murder. State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999); State v. Long, 45 S.W.3d 611, 620-21 (Tenn. Crim. App. 2000). Specifically, the state must establish a

"previously formed design or intent to kill," West, 844 S.W.2d at 147, which is sufficiently free from excitement and passion to constitute premeditation, Tenn. Code Ann. § 39-13-202(d).

Upon viewing the evidence in a light most favorable to the state, we conclude the state has not overcome the presumption of second degree murder. Although there was no showing that the victim was armed, no evidence was presented at trial indicating that the defendant made any declarations of intent to kill the victim, made any preparations to conceal the offense prior to shooting the victim, or had a previously formed design or intent to kill the victim. There was no showing of any hostility between them. Furthermore, while the defendant possessed a gun, the evidence does not indicate that the defendant procured the gun for the purpose of killing the victim. *See* West, 844 S.W.2d at 148 (noting that in failing to establish premeditation, the state failed to present proof of its theory that the defendant returned to his residence and retrieved a gun for the specific purpose of killing the victim when the defendant testified he had carried his gun with him all morning prior to the shooting). The record reflects the defendant shot the unarmed victim twice in the back of his head. The pathologist was unable to ascertain the locations of the parties at the time of the shooting but opined the muzzle was more than three feet away from the victim's heard. Based upon the evidence, we are unable to conclude that the defendant killed the victim execution-style while the victim was kneeling, although it may have been a possibility.

In contending premeditation was established at trial, the state relies upon the defendant's actions after the killing in attempting to conceal the offense. A defendant's calmness immediately after the killing is one circumstance indicative of premeditation. *See* Nichols, 24 S.W.3d at 302. However, although the defendant clearly took various actions to conceal the crime after its commission, there was no testimony about his emotional state after the shooting. *See* West, 844 S.W.2d at 148. Furthermore, the appellate courts of this state have recognized that:

> the concealment of evidence may be associated with the commission of any crime and the accompanying fear of punishment. One who kills another in a passionate rage may dispose of the weapon when reason returns just as readily as the cool, dispassionate killer. The fact that evidence is subsequently hidden from the police reveals nothing about a criminal's state of mind before the crime.

*Id.*; *see* Long, 45 S.W.3d at 621. Although the defendant's efforts to conceal evidence discredits his theory of self-defense, it does not establish premeditation. *See* West, 844 S.W.2d at 148.

Viewing the evidence in a light most favorable to the state, the homicide arose out of a dispute over money in a drug transaction that went awry. The crime proceeded from the dispute in the apartment over the money immediately to the homicide without any intervening events or dispassionate reflections. If the purpose to kill is formed in passion and executed before the passion cools, it is murder in the second degree, not murder in the first degree. State v. Brown, 836 S.W.2d 530, 539-40 (Tenn. 1992).

Unquestionably, the jury could have rejected the defendant's trial testimony as being inconsistent with the pathologist's testimony. Nevertheless, the rejection of the defendant's testimony does not, in and of itself, authorize a finding of premeditation. One could speculate the

defendant killed the victim execution-style or even that the defendant had no intention of purchasing the drugs, but rather intended to kill the victim and take the drugs. However, these are merely theories and not reasonable inferences from the evidence. While one can speculate, one "may not construct a theory" where there is no evidence to support it. West, 844 S.W.2d at 148.

We note that the defendant was also charged with felony murder in the perpetration of a robbery, and the jury acquitted him of the charge. Had the defendant been convicted of felony murder, the evidence presented at trial, including the defendant's statement to the police, would likely have been sufficient to support the conviction. However, this evidence is insufficient to support the defendant's conviction for premeditated first degree murder.

We conclude the evidence is sufficient to support a finding that the defendant knowingly killed the victim and, thus, committed second degree murder. *See* Tenn. Code Ann. § 39-13-210(a)(1). Due to the presumption in favor of second degree murder as opposed to first degree murder and the lack of sufficient evidence to support premeditation, we reverse the defendant's premeditated first degree murder conviction, reduce the conviction to second degree murder, and remand for sentencing for that offense.

## IV. CONCLUSION

We conclude the evidence is insufficient to support the defendant's conviction for premeditated first degree murder. Therefore, we reduce the conviction to second degree murder and remand to the trial court for sentencing for that offense. The defendant is not entitled to relief on the remaining issues.

_____
JOE G. RILEY, JUDGE